LISA BORT, FLORIDA DEPARTMENT OF CORRECTIONS I'm here before the court on a denial of the Section 2254 petition for writ of habeas corpus in a capital case. This court granted a certificate of appealability on three issues. My main focus today will be on the first and third issues that highlight the fact that Mr. King's constitutional rights were not only violated at the time of trial, based on discrimination during his jury selection, but then he also failed to receive due process when he attempted to have his issues heard in federal court because the district court judge did not make impartial findings regarding the merit of his issues. I will first discuss the issue of the Mill District Court copying the respondent's response almost verbatim as its order. This denied Mr. King due process and was an abuse of discretion because the findings were clearly not impartial and independent. I will start with this issue because it affects all of the other issues in Mr. King's case since the district court findings in its order, which is now being appealed, is nearly identical in form and substance to the respondent's response. What is also telling is that the Middle District issued this 91-page order just five days after Mr. King filed his reply to the response. What's your best case that's a violation of a clearly established Supreme Court precedent? I think the best case from the Supreme Court would be Jefferson v. Upton because we're saying that the fact-finding in Mr. King's case was not full, fair, and adequate, which comes directly from Jefferson v. Upton. Also in this order, the district court not only ignored arguments that Mr. King raised in his memorandum of law, but also ignored the arguments and counter-arguments that were contained in his reply brief. In essence, the Middle District's order, their findings don't quite match up with what was pled in the memorandum and in the petition. For example, in terms of Mr. King's Hearst arguments, Mr. King made arguments regarding Caldwell v. Mississippi and Sullivan v. Louisiana in both his memorandum of law and in his reply. However, the Middle District did not even mention either case in its order. Also, when this was all filed, it was prior to your Knight decision, so at the time, we were still arguing that the Hearst decision was still substantive and that also was not addressed at all. And then, also when adopting the respondent's response verbatim, the district court actually left in the respondent's tone of advocacy in many places in its order. In some areas of the order, the paragraphs are broken up a bit differently or they might have put the footnotes in the actual body of the order, but overall, it's nearly identical in terms of organization and content. Since our review of the district court decision is de novo, how does what the district court did prejudice Mr. King? My understanding is if we were still looking at what they had done and going over those findings, that it would prejudice him, but if it is going to be given a de novo review, I would say that it would not. But one of the most egregious examples of this advocacy that was left in the order is in Ground 5. In the response, the respondents had argued that there was no evidence presented to support any of the facts contained in those questions. The word facts was actually contained in quotation marks and that insinuates that the facts that were referred to were not actually facts. And the district court copied the quotation marks in this sentence in its actual order. Getting back to Judge Pryor's question, in order for your client to prevail on a writ of habeas corpus, he needs to demonstrate that the state courts made an error that would warrant the issuance of the writ. And so, I don't know if you want to address those kinds of issues that deal with the state court errors. Correct. But also, in terms of this issue, we're arguing that the middle district didn't give him the correct findings. So, they didn't make the findings whether the state court did actually, you know, in terms of finding that it was unreasonable determination of the facts and lay the evidence presented in state court or finding that it was an unreasonable application of federal law. I submit to this court that the middle district did not make those findings, so that's why it is such an issue there. So, let's just say for purposes of this argument, let's just assume that we agree with you on that. I'm not saying that we do, but for purposes of the argument, let's assume that we do. So, did you want to focus on the errors that the state courts made? Yes, yes. My next issue that I plan to address was Mr. King's Batson issue. In terms of his Batson issue, trial counsel did make a Batson objection. However, the Florida Supreme Court held on direct appeal that trial counsel failed to properly preserve the arguments that were related to the objection. And trial counsel also did not object to the gender discrimination that occurred at the trial level, which was under JEB. Mr. King maintains that if his trial counsel had properly preserved his Batson issue at trial and made the JEB claim that he would have prevailed on direct appeal. And there are four main areas where we feel that trial counsel was deficient. The first area is that trial counsel failed to identify the race of the jurors that were similarly situated to juror 111, who actually sat on Mr. King's jury. No African-Americans actually sat on Mr. King's jury, and notably, juror 111 was the only death-qualified African-American female juror in the jury pool. His jury was comprised of four white males, one male who identified as other, and seven white females. But that was never put on the record, so the Florida Supreme Court was unable to make a comparison there when they read this on direct appeal. Then the next area where trial counsel was deficient was when trial counsel failed to correct the trial court or the prosecutor regarding a misunderstanding of the facts that were contained within juror 111's juror questionnaire. Her brother actually did not have a pending drug charge, which is what the prosecutor stated as his race-neutral reason for his preemptory strike. He had only been convicted of a felony drug charge in the past. He also didn't have any charges pending. He only had the possibility of a disorderly conduct charge being filed. Then in the third issue where trial counsel was deficient, the trial counsel also failed to conduct a comparative juror analysis. This was another issue that the Florida Supreme Court found was waived because it was not brought up in the trial court. One of the reasons that the state provided for striking juror 111 was the fact that her comments regarding life in prison being worse than a death sentence. However, juror 114, who is a male who actually sat on the jury, he also made a similar comment, and that suggests that the reason was protectual. Also, juror 114's questionnaire stated that either him or a family member had been arrested or charged with a crime in the past, and that him or a family member had been convicted of a crime. However, the state did not even question juror 114 about his charges or his convictions and let him sit on the jury. What do we make of the state court's finding that Ms. Schlemmer was lead counsel and that she made a strategic decision not to select juror 111? I would say that that was actually an unreasonable determination of the facts. Because if you look at the actual trial transcript, after the state says that they want to strike juror 111, the court goes on, they're ready to go to juror 114, and Ms. Schlemmer actually says, Your Honor, we just have an issue, then Mr. Scotese immediately says, we have an objection. She is a minority, we're going to ask for a race neutral, and the court says for juror 111. So I would submit that those findings are unreasonable from the Florida Supreme Court, because if you look at the trial record, it does show that Ms. Schlemmer was the first person to say something to the court and to stop the process. So what do we do about Ms. Schlemmer's testimony at the evidentiary hearing, where she said, even though it may have been raised, she decided not to pursue it, she would have decided not to pursue it any further, because she had a note next to the name of the juror that said no, that she did not want to have this juror, the juror was 18 years old, I guess, and she was concerned that as a young woman, that she would sort of personalize the situation and identify with the victim in the case. I mean, what do we do with that? Why is that an unreasonable determination that the Florida courts said that it was a strategic decision on her part not to follow through with preserving the Batson challenge? I would say that that's post-hack rationalization under Wiggins, because she has a clear reason why she wants to find a reason not to be found ineffective or deficient, because if she is found ineffective twice, then she can no longer practice capital cases. So she's going to rationalize what might have been. But she does explain her, when she gives that testimony, she explains in terms of what she would have done at the time, because she's talking about the characteristics of the juror and why she wouldn't have wanted that juror. So I'm not sure I understand your post-hoc argument. Well, she also explained when she was going through the juror questionnaire, there are reasons why she would have wanted her to serve, the fact that she could set aside any views that she had on the case prior to coming into court, and the fact that she had said that life might be worse than a death sentence. And so she did actually concede that there were reasons why she might have wanted her on there. I submit to this court that she didn't remember exactly what had happened during jury selection, because she had stated that she didn't have an independent recollection of the facts and that she was just kind of looking at it and seeing why she might have or might not have. She even brought up the fact that she thought that it was an issue that Juror 111 may have known a police officer through her father. However, if you look at the rest of the questionnaire, it also states that she hadn't seen him in over 10 years. So there were some things that didn't quite add up. Also, in terms of the comparative juror analysis, there was other conditions that applied to many of the other jurors who sat on the jury that were similar to Juror 111's. In fact, Juror 92 was a white female who had a brother who was a felon and a son with criminal charges, and she was also charged with driving without a license herself. Juror 125 was a white male who had family members convicted of felonies. Juror 75 was a white female with a brother convicted of a DUI. And Juror 98 was another white female with a son who had come into court for a charge. And also, at the evidentiary hearing, one of the trial counsels actually admitted that he was not very good at doing a comparative juror analysis, so it wasn't his usual practice to do a juror analysis. It was hard for him to do on the fly. So we submit that that also shows that he was ineffective. The fourth area where we find that trial counsel was deficient would be when trial counsel failed to object to the discriminatory preemptory strike of Juror 111 on the basis of gender. But isn't that – I don't see how that's an error of preservation. That one is not. That's a failure to raise it before the trial court. I agree with you, yes. That was not raised before the trial court. We're saying that trial counsel should have also raised that along with their Batson claim. So at least with respect to that one, your Davis argument doesn't apply. I would say in terms of that, it would not be the Davis standard and the Roe v. Flores-Ortega standard that we're trying to argue. I would say that the JEB issue would be different from that, correct? If we disagree with you on the Davis standard of review and we go with Strickland, can you meet that standard on prejudice? Well, I would say that that's impossible to meet because the only possible effect on this would be the result of the appeal. So under Strickland, it actually says that the ultimate focus of the inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. And we're challenging the fact that if these arguments were not found to be waived by the Flores Supreme Court on direct appeal, that these arguments would have been winning arguments and that it would have been reversible error and Mr. King would have received a new trial at that point. However, because trial counsel failed to preserve these arguments, did not make these arguments at all. I mean, for instance, the JEB argument he didn't make because he wasn't familiar with the case law, the comparative juror analysis. He just wasn't good at it. He admitted that. And I would submit that there's no reason why he shouldn't have said the jury makeup on the record because the Flores Supreme Court was unable to determine those facts because at the time they had no idea what the other jurors racial makeup was. But isn't it, I mean, you'd have to show actual prejudice. And so isn't it the situation that although you wouldn't be able to show it on this record, theoretically the way one could show it would be if somebody wound up on the jury who couldn't, who could not participate in a way that would be impartial. I would say that that is what CARITELLI stands for, which is what the district court did use to support its decision. However, I would posit that his case is different because it wasn't a simple failure to preserve a claim. It was, excuse me, it was a simple failure to preserve a claim. It wasn't a failure to raise that claim in the first instance. So I would submit that. And I'm sorry, but with respect to the gender claim, which I think you have conceded would be subject, would not be subject to the Davis standard, but rather to the Strickland actual prejudice standard. Correct. Under JEB, I would say that that is separately a little bit different in terms of the analysis because that was not raised on direct appeal. However, I mean, it could also be taken with the Batson claim. There is maybe a way to kind of loop that together because, as JEB says, it is common for prosecutors to use gender as a pretext for racial discrimination, and that is very common in the preemptor cases where they involve striking of minority women. But if you were to find that since that was not raised below, I would say that the issue of that being prejudicial to Mr. King is some of the other evidentiary hearing testimony where trial counsel said that he finds that women are less likely to give the death penalty. So I would say that it's prejudicial in that respect, that another woman could have sat on the jury and she may have voted for life, which would have been prejudicial for Mr. King not to have that on his jury. But we do feel that Mr. King's case is very similar to Davis v. Secretary for Department of Corrections, just as in Roe v. Flores-Ortega, the fact that this is only showing the possible impact on his appeal and the showing effect on the trial would be impossible. We do feel with his Batson claim that that would be the proper standard. Is there any Supreme Court precedent that would clearly establish that standard? I would say that there is nothing directly on point. However, as this court has used Roe v. Flores-Ortega in the past in a similar situation, I would submit that this court could do that again in this case since it is so very similar, and it is a narrow, razor-thin exception like was detailed in Davis. So I do feel that this is a very similar situation because his Batson claim was not able to be fully addressed on the merits due to the fact that these issues were not properly preserved. They were only able to consider on the direct appeal posture the fact that the prosecutor did at the time have a race-neutral reason, but it was an incorrect race-neutral reason because based on the questionnaire, there was no pending felony drug charge for Jury 111's brother. So that would be the situation. I feel like that would be more similar to Davis than anything else. And the responses do cite some cases where trial counsel made no Batson objection at all, and we do feel like that would be different and that would be under moral purpose or something along those lines as opposed to Davis. Because under Batson, Mr. King has a right to be tried by a jury whose members were elected pursuant to non-discriminatory criteria, which was not the case in his case. There was no minorities on his jury. So in terms of this issue, I feel that this Court should find that it was unreasonable for the lower courts to determine that the state's reasoning for striking Juror 111 was race-neutral and that the Florida Supreme Court and the Middle District improperly applied the Caritelli analysis, which was based on a cause challenge, not a Batson claim, to Mr. King's case. And held Mr. King to an incorrect standard of showing that an actually biased juror sat on his jury instead of Juror 111, and that this Court should remain with directions to grant Mr. King's petition for a writ of habeas corpus on that issue. And then the other issue that is in the brief that was unrelated to the District Court's order would be that Mr. King received ineffective assistance of counsel because his trial counsel failed to investigate evidence of the toxic exposures throughout his life and with his career as a plumber as well, and to present it at the penalty phase. Just a couple of things I wanted to address real quickly on that. There is a lot of references in the direct appeal opinion, or excuse me, in the direct appeal record, which does have where his father said he lived on a farm, both of his brothers mentioned the farm, the sledding incident took place on a farm, which was mentioned throughout all of the orders. So there is a lot of evidence that he did live on a farm, and then he lived near a farm, and he also worked on a golf course. And it's also indisputable that he worked as a plumber as well. And basically the additive effect of all of these toxic exposures combined together with his head trauma in order to exacerbate his symptoms. So we would say that that would be the issue there. And if the jury had heard this information, there is a reasonable probability that at least one juror would have voted for a life sentence. And if they had, Mr. King would have been entitled to a new penalty phase under Hearst. And other than that, if this court does not reverse based on Mr. King's claims related to ineffective assistance of counsel, we do feel that this court should vacate the district court's order because the district court abused its discretion and denied Mr. King due process by issuing order that was almost verbatim to respondents' response and failed to meaningfully consider his arguments. And if this court were to vacate the order and remand, we would ask that it would be remanded to a different middle district judge in order to preserve the propriety of justice. If the court doesn't have any further questions, I will reserve the remainder of my time for rebuttal. Thank you. Thank you. Good morning. Good morning. Scott Brown on behalf of the state of Florida. The appellant is in the very unusual posture of seeking to reverse Mr. King's conviction and death sentence on the basis of a juror that lead counsel didn't even want to sit on the jury. Carolyn Schleimer, there's no dispute below, Your Honors, that she was in charge of jury selection. There is no dispute. She had no independent recollection of it. I mean, why is that not a post hoc justification? Because all the questionnaires had a big no or yes. We don't know who wrote that. We thought it was Mr. Scotese, but it's clearly no one. A member of the defense team did. And when shown the questionnaire, Ms. Schleimer had a clear recollection and said, look, the victim in this case is a young mother who endured the most horrible ordeal she would likely identify with her. Terrible crime. Horrific. But I thought about this a lot. It doesn't make any sense to me why a person defending a person who's facing a death sentence would take off a juror who says, I would always vote for life without parole over the death sentence. I mean, strategically, why would you do that? Well, I think a number of reasons. The police officer relationship, the fact that she liked CSI. Both sides apparently don't like jurors in this case who watch CSI because it holds either the defense or the state to a different burden. So my point is this. Strickland prohibited hindsight, post hoc perhaps rationalizations, but you presume counsel's effective. So that presumption, if counsel has a clear recollection now and there's a no on that juror questionnaire, is that an unreasonable determination of the facts? And I submit no because no one disputed that Ms. Schleimer was in charge of jury selection and did not want that juror on the jury. So even if we get past that hurdle, and there is no Supreme Court case that says if your lead counsel for tactical reasons doesn't want a juror on your case, that counsel can be held ineffective for failing to perfect or pursue a Batson objection. I think her argument is that that's an unreasonable finding of fact because it was based on a witness, Ms. Schleimer's statement, that she didn't have any independent recollection of what happened. And there is no witness to testify below to contradict her recollection after seeing the questionnaire or why that no was on the questionnaire. Mr. Scotese didn't say, hey, look, I wanted her on the jury. He had no doubt that it was Ms. Schleimer's call on the jury. So even if we get past that, Your Honor, and you find an unreasonable determination of facts, and again, as a reviewing habeas court, those fact findings are entitled to presumption of correctness. We win hands down on prejudice because caritelli is the law in the state of Florida, and there is not a single Supreme Court case that contradicts the idea that in post-conviction, when you're looking at a jury selection challenge, you have to examine prejudice at the time the error is made by counsel. That is the trial, and you have a Supreme Court case. If we were even trying to read the tea leaves on where the Supreme Court would go, it's Weaver v. Massachusetts. Now, in that case, there was a structural error that was not preserved at the time of trial. It was raised for the first time in post-conviction as an ineffective assistance of counsel claim, and they said you're not in the same position had it been raised and preserved at the time of trial, and that defendant has to prove prejudice. So we have a little bit different question that I wanted to ask you about. So the Florida Supreme Court, I guess we look to their reasoning. Am I right about that? I mean, we look to their reasoning on the Batson ruling, right? On the post-conviction. Right, okay. And it says King has not demonstrated prejudice because he offered no evidence to indicate that any of the jurors who were seated in this trial were actually biased, period. That's not what Strickland says. So why is that not an unreasonable application of established Supreme Court precedent? Well, first of all, Strickland didn't address ineffective assistance during a jury selection challenge. However, Strickland actually does say undermine confidence in the outcome at trial. So I suggest to you that Strickland actually supports the Florida Supreme Court. What about equal protection? I mean, what Strickland says is it's a violation of the defendant's equal protection rights to remove people from the jury based on their race. As far as I can tell, the Florida Supreme Court didn't talk about that. It's also a violation of the juror who's been stricken on account of her race. It's a violation of her right. And as the court said in Strickland, it hurts the community as well. It seemed like the Florida Supreme Court decided based on this, you know, the juror wasn't, I mean, there's no demonstration that there was a biased juror that participated. Correct. And I think the case law is pretty clear. And I think the majority view, and the state cites Young v. Bowersox, is in line with this court's later precedent after Davis, like Caritelli v. Stett, Purvis v. Crosby, is that you have to, if you have an unpreserved jury challenge issue, you're not entitled to any particular jury on your jury. You need to show a different... I'm sorry to interrupt, but I'm not sure that's what Purvis says. I think Purvis applies in a situation where the alleged error isn't raised at all. And in this case, the error is raised, it's just not preserved. But I think Purvis is very clear in saying we're not on the Davis side of things because here the error wasn't raised at all. So I'm not sure that Purvis is going to help you in the situation where the error was raised but not preserved. Well, I think, too, that Davis has to be examined in light of the fact there was no ed pedeference due to the state court ruling because they sidestepped the issue. So there was no case, there was no Caritelli where the state court was applying its clear law, which you have in this case. You have, not only do you have the tactical decision, but you have state, well-established state law that says you have to look, is there a biased juror, is there an impact on the outcome of the trial? So I think Davis is also distinguishable because there was, under habeas, no ed pedeference due, and that's in this court's opinion. This court's later cases distance itself from Davis, and that is one of the reasons I believe that this court gave in Purvis. But I think Caritelli v. Stepp is directly on point. Again, you can't find or cite a Supreme Court case that contravenes the Florida Supreme Court's prejudice analysis. The state wins, but the state also wins. What about the fact that this was a peremptory strike as opposed to a strike for cause? I don't think that matters in the context of jury selection. You're looking at the outcome at trial. Well, it seems to me that the actually biased standard doesn't match up when you're analyzing peremptory strikes. I think it would also, it has to, and then also at the time of trial, what is the outcome here in a case, again, where you have overwhelming evidence of guilt? Is there any reason to believe, and Young v. Bowersox, and it goes in that an African-American juror will view this overwhelming evidence in this nonracially challenged or charged case, this evidence any differently than the jurors who sat. And again, if you even get to the point where you're going, okay, what is the defendant's burden here to show that that peremptory strike was actually pretextual and it was based on racial bias? We win, the state wins hands down on the merits on that claim as well. Remember, now you have, in the defense brief, one thing that was notably missing, the comparative juror analysis to show that there was a pretext here. Now, they mentioned only one juror in their brief, juror 114. That juror was born in 1938. There is no comparator in this case that suggests, much less establishes, that these strikes were, this strike was based on a discriminatory intent. There were multiple reasons given. The first one was meek, youth, and inexperienced. That is a clear basis for the strike. The Florida Supreme Court cited Rice v. Collins. Youth and inexperience is a valid racially neutral reason to exercise a strike. So even if we get past the tactical decision of counsel, the lack of prejudice, and we go on to the merits of the strike and actually look at it, the facts below, in light most favorable to the state court, there is no indication that that strike was based on racial bias or animus. None. So there is not a record upon which this court can grant relief in this case. The next issue I want to address briefly, ineffective assistance of counsel. Trial counsel had Mr. King examined by no fewer than eight experts, mental health experts, in an effort to develop mitigation counsel. They found Mr. King was a malingering. He was a pathological liar. Most of these experts could not be called during the penalty phase for that reason. Counsel didn't stop there. They ultimately focused upon brain damage based on a PET scan objective testing, which they linked to a sledding accident. Brain damage was presented at the time of trial. So now we're in postconviction, and despite all that counsel did do, all these experts that counsel did consult with, they found an out-of-state toxicologist who was not quite a doctor yet, but he was a master's level toxicologist who said that King grew up on a farm, only he didn't grow up on a farm. He was located near farmland. Dr. Lugo had very limited testimony concerning general or anecdotal exposure in Mr. King's background to toxic chemicals, I guess, when you live near farmland. He couldn't cite to any studies. His general testimony was speculative. So how do you evaluate that as a habeas court? Because counsel went to extraordinary efforts. This was in a case like Wiggins or Rompia where counsel failed to investigate Mr. King's background. What counsel did do was present evidence of brain damage and a statutory mental mitigator was found. So in postconviction, Mr. King says, we thought we could have improved upon that by saying, okay, he was exposed to chemicals. So there's an alternate explanation, perhaps for brain damage. But Mr. Lugo, Dr. Lugo, wasn't a medical doctor, was not qualified to diagnose brain damage. So what we have is very general testimony that he was exposed to chemicals. Has that added anything to Mr. King's case in mitigation? No. And again, this is an overwhelmingly aggravated case. I will not go into the facts here, but they are shocking even by capital case standards. So have we altered? Let me ask you this. If Mr. King's exposure to toxic chemicals had been presented, couldn't that have affected the court's weighing of the mitigating versus the aggravating factors? No, Your Honor. Absolutely not. I understand your argument that it would be another side of the brain damage argument, but I don't see how we could say that would not have affected balance. Well, I suggest to you that if your case all is pretty clear, that if it's largely cumulative, you don't grant relief on ineffective assistance. And I would submit to you that this was much weaker than what the Evidence Council actually presented, and it would detract from it because, hey, we actually have concrete evidence over here based on a PET scan, and then we have some ambiguous theory over here without any support in any studies. I mean, Mr. King grew up near farmland like millions of other Americans. He couldn't cite a single study. So you're not talking about a brand-new mitigator in a case that is highly aggregated where the jury had heard a tape of this victim begging for her life. So how does that, if this case doesn't pass that hurdle, then no case will. I'm sorry. You're talking about evidence on a mitigator already presented against HAC, CCP, and the horrible facts of this case. So, no, there was no unreasonable determination in state court below. The trial counsel's efforts in this case were extensive and fully complied with Strickland, Rompia, Wiggins. There's not a single case the defendant has cited that suggests the counsel could be found ineffective in this case. The Florida Supreme Court said there is simply no evidence to suggest that King's exposure to toxic substances would be anything more than pure speculation. Why is that not an unreasonable determination of the fact? I mean, you've told us there was evidence in the record that he at least lived near farmland, and we know that he was a plumber. Correct. But it's not that there's no evidence, right? Evidence that would apply to virtually anyone else, including myself, anyone who grew up in a suburb of Pontiac, Michigan. So, again, the important distinction here is Mr. King wasn't an agricultural worker. He wasn't doused with chemicals. Toxic exposure was actually considered and rejected based on what Mr. King advised a neuropsychologist who was retained by counsel. So was there evidence of some possible exposure? Sure. As a plumber, at least that was more concrete. He was exposed to common plumbing chemicals like every other plumber. He had a co-worker who testified that Mr. King was like a supervisor on plumbing jobs, and she used the same chemicals that he did. Its effects were temporary when she left the job site. So, again, you're not talking about powerful mitigating evidence in this case. But they said no evidence. I think it's Judge Pryor's point. I'd say if you're saying was there evidence, sure. And that was at least chemical. We do know that. I'm not disputing that there was some evidence that he was exposed to plumbing chemicals like every other plumber. I would suggest to you that the living near farmland was not supported. There's no evidence that he was ever doused with a single chemical. He didn't grow up on a farm. He wasn't raised on a farm, and he was not a farm worker. So I think if you're weighing all of the evidence out again in post-conviction, you've hardly altered the mitigation side in a very heavily aggravated case. So we submit that he has not met his burden under the ADPA. I would like to briefly address the order issue. A trial court, a district court, like any other judge, can adopt a portion or an opposing party's arguments entirely. In this case, the state relied on the lower court rulings, well-established law in its argument to the district court. There is no due process violation. There is no Supreme Court case that says that's inappropriate. To the contrary, the state cited, I believe, Bessemer v. North Carolina. But, I mean, it's certainly better practice not to do that. Your Honor, I think in this day and age that, yes, there are, and some judges probably do a better job of copying and trying to change it, altering it. But if they agree, or the law court, and, again, I'm not trying to be, you know, it's interesting. You know, I think that there's nothing improper. There's no allegation of ex parte contact with the state. So, really, you have a judge that is looking it over, changes some things around and agrees with the state's argument. There's no case law that suggests that that is wrong. In fact, in Bessemer, the Supreme Court said not only isn't that wrong, but you're not even entitled to a more stringent standard of review just because you adopt the other party's argument. As a factual matter, do you agree with Mr. King that the district court's order didn't analyze or address any arguments in Mr. King's reply brief, just as a factual matter? In his reply? His argument is that in his reply he made some arguments that the district court, in its order denying relief, did not address at all. I don't believe so. I'd have to go back and check the orders. But I think the district court order is comprehensive, and all the arguments were made. There's certainly no reason for this court, and as this court has already recognized, it's de novo review. There was no evidentiary hearing below. So, you know, you have the order, and this court has the benefit of the party's briefs on these issues. So I don't know that there's any constitutional error that can arise from merely copying a party's argument before the court. And, again, certainly nothing that would entitle the defendant to any kind of relief under the ADPA. Mr. Brown, before you, you sound like you're winding up. So before you sit down, I wanted to go back to the Batson issue for just a second. Assume for me that we get to de novo review on the prejudice issue. Ms. Bort said if there had been one juror who voted for life without parole, Mr. King would have been entitled to relief from the Florida Supreme Court under Hearst. Is that—what's your answer to that? I think it's a wild guessing game. I don't think that's really the standard. I think—I mean, in reality, the Florida Supreme Court has been finding harmless error most often or mostly in 12-0 cases. But it could have happened, right? I mean, I don't think there's any reason to believe that juror 111 would have viewed this— I want you to assume for me that juror 111 would have voted like she said she would for life without parole. I can't speculate that. No, no, I don't want you to speculate. That's my hypothetical. It happened. I mean— I'm not—I wouldn't give her the benefit of the doubt. I'm sorry? I would give her the benefit of the doubt, and if she heard all that evidence, including a tape of a victim— I'm not talking about her. I'm talking about Mr. King. Doesn't that—couldn't he show prejudice based on that, assuming that set of facts? No. He does not have a 12-0. He has 11-1, one juror voting for life without parole. And so he could have gotten relief under Hearst in Florida. I think if you speculate that, yes, if one juror voted, it is unlikely the court would have found it harmless. But you're speculating beyond that. I'm just—that's what we do. We do hypotheticals, you know, because we have to test these principles. I would say yes. If he had an 11-1 when Mr. King's case was on post-conviction review, it is likely— but I'm stating to you that there is a consensus in Mr. King's case that ran among all of the jurors, that his crimes were so heavily aggravated, the crime so horrible, I don't believe juror 111 if you speculate. No, Your Honor. I think juror—I'm giving juror 111 more credit that she would have voted for the death penalty in this case. So, again, if we were going down that path—I was going to take it one step further, Your Honor, and say I don't believe juror 111 would have viewed this evidence any differently. I hear you. I hear you. But that's just not my hypothetical. Thank you. Thank you, Your Honor. If there are no additional questions, I ask that you affirm the decision below. Thank you. Thank you. I do agree with this court that we are trying to establish that the Florida Supreme Court's decision was an unreasonable finding of the facts in light of this evidence presented in state court. In terms of the Batson issue, as you noted, they don't know who wrote no on the notes. Also, some of the— I know it was somebody from the defense. I mean, it wasn't like the prosecution wrote no. They are speculating the fact that they believe it was one of those three attorneys, and that is probably likely. However, some notes on one of the sets of notes appear where it appears juror 111 is getting confused with the next juror in the line. So there might have been some sort of confusion at that point because the notes were together next to each other. I guess sometimes when you have three people making a decision, they don't all agree either, right? That could also be the fact. However, there was also some notes written about some of the other jurors where it specifically noted that Ms. Schlemmer did not like the juror or did not want the juror. So I submit since there was no findings like that—or excuse me, no notes like that written next to these juror notes for juror 111, that Ms. Schlemmer did not have any reason where she did not want this juror to serve at the time. Also, Mr. Scotese did testify at the evidentiary hearing that he was not trying to lose the objection and he was trying to preserve the Batson objection for appeal. Also, the respondents are stating that Weaver would be something that would be controlling. However, we find that that would be distinguishable because Weaver actually specified that the opinion does not address whether they should find any differently in terms of a Batson issue or a JEB issue that was raised instead on an Infective Assistance of Counsel claim on collateral review. So I do feel that Weaver is distinguishable. Also, in terms of Purvis, that was a courtroom closure issue where trial counsel did not object at all. It was not like Mr. King's case where there was an objection made but the arguments were not preserved for appeal. Also, Bowersox comes out of a different circuit, but that was also a Batson issue where trial counsel did not object at all. We also think that Caritelli v. Stepp was distinguishable due to the fact that it was a cause challenge. So in that case, you could show that actually a Batson juror did serve because there was a reason why trial counsel should have objected for cause in the first place. Except the only problem with that is that the Florida Supreme Court cites Caritelli and says it applies in this circumstance, and we have to apply Florida state law. So what do we do about that? I would say that in this situation, since it wasn't an unreasonable determination of the facts, I would say this court should review it de novo just as they did in Davis. So you're saying we shouldn't get into the Caritelli argument? Because if we do get into the Caritelli argument, I don't know. Let's just assume for purposes of the question that we have to reach the Caritelli argument. What is your response in light of the fact that the Supreme Court of Florida relied on it in this circumstance even though it involved a peremptory? Again, I would say that in this situation, this should be determined under Strickland, whereas in Strickland, it specifically says the result of the proceeding being challenged. It does not say it has to be the trial. So again, take it together with Flores-Ortega to find that it's not always fastened to the forum in which the objection should have been made. So your position would be that Caritelli or at least the Supreme Court's, the Florida Supreme Court's interpretation of Caritelli is an unreasonable application of federal law? Correct, unreasonable determination or unreasonable application of Strickland. And then in terms of the second issue, again, we feel that that's an unreasonable determination of the facts. We don't feel that that's cumulative since no evidence of the actual toxic substances or how they affected Mr. King was presented at trial. Dr. Lugo even said that pesticides were flown in airplanes and dropped down through the air. So even at the times where he didn't live on the farm, which there is a lot of sites in the record where his brother said, we lived on a farm, a 33-acre farm, and we did a lot of farming. And they said, yes, we lived in a farming community with Mennonites and Amish. There was a big red barn there and the rocks were there. It can only go so far by where black Angus cows were at. And then his younger brother also specified that I didn't realize the farm was on the same road until later my dad says, oh, yeah, the farm was down the road. I had speech classes when I was younger. We lived in Mayville, you know, on a farm. I remember in 77, I went to school when I lived on the farm. And he also talks again about that would be back on the farm. That was back in the 70s. And even the father mentioned, yes, I do, we lived on a farm. So I submit to you that there is a lot of references to the farm at trial itself. But for the times where he did live near farmland, when they're dropping pesticides down from airplanes, like Dr. Lugo testified, it can still affect the people that live near the farmland, which Dr. Lugo testified that he always lived within farmland. And there was also times where he worked at a golf course and he was being exposed to all the pesticides that they were putting on to keep the grass green at the golf course. And then all the time that he worked as a plumber, of course, as well. And then as to the third issue, we find that Bessemer would be distinguishable because in Bessemer the court provided a framework for the proposed findings and the other party was provided and availed itself to the opportunity to respond at length to the proposed findings, whereas we submit to you that in this case Mr. King did not have that same opportunity because many of his arguments were not even addressed by the Mill District at all. And then also in Bessemer it's noted that the order varied considerably in organization and content from those submitted, which is clearly not the case here because pretty much the whole order is copy and pasted. And it clearly would take longer than five days to write a 91-page order from scratch. If there are no further questions, I ask that this court reverse the ruling of the Mill District and remand Mr. King's case with directions to grant his petition for writ of habeas corpus. Thank you very much. Thanks to both of you. These cases are so difficult and we really do rely on the assistance of counsel and I think both sides ably assisted us this morning, so thank you.